# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

CHRISTOPHER EARL WATTS #369452,  )
                                 )
    Petitioner,                  )    No. 3:17-cv-00795
                                 )
v.                               )    JUDGE TRAUGER
                                 )
BLAIR LEIBACH,                   )
                                 )
    Respondent.                  )

## MEMORANDUM OPINION

Petitioner Christopher Earl Watts, a state prisoner incarcerated in the Trousdale Turner Correctional Center in Hartsville, Tennessee, has filed a petition for the writ of habeas corpus under 28 U.S.C. § 2254 and has paid the filing fee. The court will grant the petition in part and deny it in part for the reasons explained below.

## I.    FACTS AND PROCEDURAL HISTORY

The Tennessee Court of Criminal Appeals cogently summarized the evidence at trial when it reviewed the petitioner's post-conviction appeal:

> [I]n April 2007, the petitioner was in a romantic relationship with Lakeisha Watkins. *State v. Christopher Earl Watts*, No. M2009-02570-CCA-R3-CD, 2012 WL 1591730, at *5 (Tenn. Crim. App. May 3, 2012). The petitioner lived with Ms. Watkins and the victim, Ms. Watkins' then fifteen-month-old child, in an apartment rented by Ms. Watkins. *Id.* The petitioner periodically babysat for the victim. *Id.* at *10.
>
> On April 16, 2007, the petitioner babysat the victim while Ms. Watkins went to the dentist. *Id.* at *5. According to a statement later given by the petitioner to the police and played for the jury at trial, while babysitting, the petitioner brought the victim with him while he took the trash outside to the dumpsters. *Id.* The victim let go of the petitioner's finger, began running, and fell down a nearby hill. *Id.* The victim injured his lip, and a knot eventually appeared on his head. *Id.* The petitioner denied there were bruises on the victim's face. *Id.* The fall occurred around 11:00 a.m., but the petitioner and Ms. Watkins waited until 7:00 p.m. to take the victim to the hospital. *Id.*
>
> Dr. Lawrence Stack, an emergency medicine physician at Vanderbilt Hospital,

and a resident examined the victim on April 16, 2007. *Id.* at \*6. The petitioner identified himself to the doctors as the victim's stepfather and said the victim fell "'flat on his face'" while he and the victim were walking down the hill to take out the trash. *Id.* The petitioner further reported that after falling, the victim slept for most of the day. *Id.* Dr. Stack noted the victim was fussy, unresponsive to attempts to open his eyes, and had multiple bruises on his forehead, face, upper arms, and shoulders. *Id.* Dr. Stack diagnosed the victim with a concussion and admitted him to the hospital so the Care Team, a consultation service responsible for evaluating children suspected of being abused, could evaluate his bruises and home environment. *Id.* at \*6–7.

After being discharged from the hospital, the victim lived with Ms. Watkins' father for approximately three weeks. *Id.* at \*3. The victim subsequently lived with Ms. Watkins' mother for another three weeks. *Id.* at \*4. Eventually, Ms. Watkins asked if the victim could return to her home. Id. at \*11. After a site visit from a case worker during which Ms. Watkins lied and said she was no longer in a relationship with the petitioner, the victim began living with Ms. Watkins and the petitioner again. *Id.*[1]

The petitioner and Ms. Watkins continued to reside together in June 2007. *Id.* at \*5. According to the petitioner's statement, the morning of June 13, 2007, the victim had a seizure while the petitioner changed his diaper. *Id.* at \*5. It was hot in the apartment, so the petitioner thought the victim was having a heat stroke. *Id.* The petitioner put the victim in front of a fan, and the victim "'snapped out of it.'" *Id.*

Nicole Riley, the petitioner's cousin, testified that on the afternoon of June 13, 2007, the petitioner brought the victim to a birthday party at her house. *Id.* at \*7. The victim "'just stood there'" and did not move, talk, or play. *Id.* Ms. Watkins later arrived, and the victim began to cry. *Id.*

According the petitioner's statement and Ms. Watkins' trial testimony, somebody named Michael spent the night in the apartment on June 14, 2007. *Id.* at \*5, \*12. The petitioner did not think Michael hurt the victim. *Id.* at \*5. Ms. Watkins testified that Michael never had contact with the victim. *Id.* at \*12.

The petitioner further indicated in his statement that on the morning of June 15, 2007, he woke up to find the victim had gotten out of his playpen, gone downstairs, and was "leaning on the couch." *Id.* at \*5. At some point, the victim began screaming, and Ms. Watkins gave him Tylenol. *Id.* Later that day, Ms. Watkins fed the victim and exited the apartment, leaving the petitioner alone with the victim. *Id.* Shortly thereafter, the petitioner noticed the victim's lips were blue, and he appeared lifeless. *Id.* The petitioner ran outside and called for help. *Id.* The petitioner, who did not know how to perform cardio pulmonary resuscitation ("CPR"), blew into the victim's mouth and "'pressed'" on the victim. *Id.* A

---

[1] Actually, it appears from the trial transcript that the case worker was informed approximately one week before her May 29 site visit that the victim was again living with his mother. (Doc. No. 13-5 at 60, 62–63.)

female neighbor then performed CPR on the victim, and he began to breathe. *Id.*

Ms. Watkins offered a slightly different version of the events occurring June 15, 2007. *Id.* at *11. According to Ms. Watkins' trial testimony, around 9:00 a.m., she heard the victim screaming and got out of bed to check on him. *Id.* The petitioner was holding the victim and told Ms. Watkins that he found the child downstairs, "'asleep standing up.'" *Id.* About five minutes later, the victim had a seizure that lasted five to ten minutes. *Id.* The petitioner did not want to call an ambulance, so she gave the victim Tylenol and let him sleep. *Id.* The victim remained weak and sleepy for the remainder of the day. *Id.*

Around 9:45 p.m., Ms. Watkins left the apartment to get something to eat while the petitioner watched the victim. *Id.* When she left, the victim appeared to be breathing normally. *Id.* When she returned about five minutes later, the victim was not breathing. *Id.* One neighbor performed CPR, while another called 911. *Id.*

Dr. Sandra Moutsios, a pediatrician and internist at Vanderbilt Hospital, testified at trial as an expert in pediatric medicine and child abuse. *Id.* at *7. According to Dr. Moutsios, after coming to the emergency room on June 15, 2007, the victim was treated for continuous seizures, stabilized, and admitted to the hospital. *Id.* Dr. Moutsios was part of the Care Team to subsequently evaluate the victim. *Id.*

Dr. Moutsios testified extensively about the injuries sustained by the victim and indicated "'it was his mental status that was most concerning.'" *Id.* Dr. Moutsios opined the victim sustained multiple injuries to his brain, one of which was acute and occurred within a couple days of June 15, 2007. *Id.* at *9. The other brain injuries were older. *Id.*

Because the brain injuries were different ages, they were not the result of a single fall down the stairs. *Id.* at *9–10. According to Dr. Moutsios, had Ms. Watkins and the petitioner sought medical treatment for the victim prior to the seizure occurring June 15, 2007, the later seizure may have been prevented. *Id.* at *9.

In addition to brain injuries, the Care Team discovered that the victim suffered a fracture to his left arm bone near the wrist. *Id.* at *8. Dr. Moutsios described the fracture as a "'buckle fracture'" meaning "'there was some force that caused the outside layer of the bone to actually buckle.'" *Id.* Significant force would have caused the fracture and could have been the result of a "'twisting mechanism.'" The fracture had started to heal, and Dr. Moutsios estimated the victim's arm was broken one to two weeks before he was brought to the hospital on June 15, 2007. *Id.*

At the petitioner's trial, the State made reference to Ms. Watkins living in the "projects" and Mr. Watkins living "on the streets" in its opening statement.[2] Trial

---

[2] The petitioner's claim during post-conviction proceedings and in his pending habeas petition is that there were references at trial to Ms. Watkins' living in the "projects" and *his*, Mr. Watts', living "on the streets." (Doc. No. 1 at 8; Doc. No. 13-24 at 5.)  This reference to a "Mr. Watkins" living "on the streets" is presumably a typographical error meant to refer to Mr. Watts. Later in

counsel did not object. The State then called the following witnesses as part of its case-in-chief: Janell Driver, a paramedic with the Nashville Fire Department; Bryan Jones, a paramedic with the Nashville Fire Department; Falonda Tolston, a case manager for Child Protective Services; Detective Woodrow Ledford of the Metropolitan Nashville Police Department ("MNPD"); John Watkins, Lakeisha Watkins' father; Pamela Watkins, Lakeisha Watkins' mother; Detective Faye Okert of the MNPD; Dr. Lawrence Stack, an ER physician at Vanderbilt Hospital; Jessica Mitchell, Ms. Watkins' next door neighbor; Nicole Riley, the petitioner's cousin; Latoya Starks, a neighbor of Ms. Watkins; Dr. Sandra Moutsios, a pediatrician and internist at Vanderbilt Hospital; and Ms. Watkins. *Id.* at *1–12. In addition, the State played the petitioner's videotaped statement to police, and a video of the victim seizing. *Id.* at *5. The State then rested. *Id.* at *13.

The State made the following election of offenses at the close of its proof:

> Count 1, the [petitioner] committed aggravated child abuse on or about April 16, 2007, by causing severe head injuries to the victim, including a concussion, inability to open eyes, and multiple facial bruises; count 2, the [petitioner] committed child neglect by failing to seek timely medical treatment for head injuries the victim sustained on April 16, 2007; count 3, the [petitioner] committed aggravated child abuse on or about June 15, 2007, by causing severe head injuries to the victim, including anoxic brain damage, acute subdural and subarachnoid hemorrhages, retinal hemorrhages, and severe seizures; count 4, the appellant committed aggravated child neglect by neglecting the victim's welfare and failing to seek timely medical treatment for seizures the victim experienced on the morning of June 15, 2007, and his "decreased physical abilities throughout that day;" count 5, the appellant committed aggravated child neglect by neglecting the victim's welfare and failing to seek timely medical treatment for the seizures the victim experience on or about Wednesday, June 13, 2007; count 6, the appellant committed aggravated child abuse by causing a subdural hematoma and other brain trauma to the victim between May 29 and June 15, 2007; and count 7, the appellant committed aggravated child abuse by causing a fracture to the victim's left ulna between May 29 and June 15, 2007.

*Id.* at *7.

The petitioner declined to put on proof. Outside the presence of the jury, the trial court held a *Momon* hearing, where the petitioner confirmed his decision to waive his right to testify was voluntary.

(Doc. No. 13-26 at 2–5.)

---

this same opinion, the Tennessee Court of Criminal Appeals discusses "the facts that Ms. Watkins lived in the 'projects' and the petitioner lived 'on the streets.'" (Doc. No. 13-26 at 5.)

On September 3, 2009, the jury convicted the petitioner on all seven counts: aggravated child abuse, count 1, offense date April 16, 2007; child neglect, count 2, offense date April 16, 2007; aggravated child abuse, count 3, offense date June 15, 2007; aggravated child neglect, count 4, offense date June 15, 2007; aggravated child neglect, count 5, offense date June 13 to June 14, 2007; aggravated child abuse, count 6, offense date May 29 to June 15, 2007; and aggravated child abuse, count 7, offense date May 29 to June 15, 2007. (Doc. No. 13-1 at 105–11.) The trial court sentenced the petitioner to 25 years in prison for each of the aggravated child abuse convictions in Counts 1, 3, and 6. (*Id.*) It merged Count 2 with Count 1 and ordered the sentences for all the other convictions to run concurrently with one of the 25-year sentences, for a total effective sentence of 75 years. (*Id.*)

On direct appeal, the Tennessee Court of Criminal Appeals reversed the petitioner's convictions on counts 2, 5, and 7, finding that there was insufficient evidence to support them. (Doc. No. 13-16.) The court affirmed in all other respects in its opinion dated May 3, 2012. (*Id.*) The Tennessee Supreme Court denied permission to appeal on September 20, 2012. (Doc. No. 13-19.)

The petitioner filed a *pro se* petition for post-conviction relief in the trial court on June 18, 2013. (Doc. No. 13-20 at 53.) The court appointed counsel, who took no action in the case and was replaced by substitute counsel on January 14, 2015. (*Id.* at 64, 67.) The petitioner's new attorney filed an amended post-conviction petition on February 27, 2015. (*Id.* at 70.) The court held a hearing on the petition on April 22, 2015 (*id.* at 80) and denied relief on January 11, 2016. (*Id.* at 81–104.) The Tennessee Court of Criminal Appeals affirmed on January 27, 2017 (Doc. No. 13-26), and the petitioner did not seek discretionary review from the Tennessee Supreme Court.

The petitioner's petition for writ of habeas corpus pursuant to Section 2254 is deemed filed in this court on April 28, 2017 (Doc. No. 1 at 9), and the respondent acknowledges that it is timely. (Doc. No. 21 at 2.)

## II.     ISSUES PRESENTED FOR REVIEW

The petition raises the following claims for relief:

1. There is insufficient evidence to support the petitioner's convictions for aggravated child abuse in counts 1, 3, and 6. (Doc. No. 1 at 4.)

2. The trial court erred by not severing the charged offenses for trial. (Doc. No. 1 at 6.)

3. The trial court erred by instructing the jury that the petitioner's co-defendant was an accomplice. (Doc. No. 1 at 6.)

4. The petitioner's sentence is excessive and was based on facts not found by the jury in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). (Doc. No. 1 at 7.)

5. Trial counsel was ineffective for failing to provide adequate information and advice about waiving the right to testify at trial. (Doc. No. 1 at 7.)

6. Trial counsel was ineffective for failing to call certain witnesses. (Doc. No. 1 at 8.)

7. Trial counsel was ineffective for failing to file a motion in limine to exclude evidence about "living in the projects and on the streets." (Doc. No. 1 at 8.)

8. Cumulative effect of trial counsel's ineffectiveness warrants a new trial. (Doc. No. 1 at 8.)

## III.     STANDARD OF REVIEW

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and

injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Peterson v. Warren*, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979)). Where state courts have ruled on a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (d)(2). A state court's legal decision is "contrary to" clearly established federal law under Section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially

indistinguishable facts." *Williams*, 529 U.S. at 412–13. An "unreasonable application" occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. A state court decision is not unreasonable under this standard simply because the federal court finds it erroneous or incorrect. *Id.* at 411. Rather, the federal court must determine that the state court's decision applies federal law in an objectively unreasonable manner. *Id.* at 410–12.

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under Section 2254(d)(2) simply because it disagrees with the determination; the determination must be "'objectively unreasonable' in light of the evidence presented in the state court proceedings." *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). "A state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding' only if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support in the record." *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007) (quoting § 2254(d)(2) and (e)(1)); *but see McMullan v. Booker*, 761 F.3d 662, 670 & n.3 (6th Cir. 2014) (observing that the Supreme Court has not clarified the relationship between (d)(2) and (e)(1) and the panel did not read *Matthews* to take a clear position on a circuit split about whether clear and convincing rebutting evidence is required for a petitioner to survive (d)(2)). Moreover, under Section 2254(d)(2), "it is not enough for the petitioner to show some unreasonable determination of fact; rather, the petitioner must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011). Thus the standard set forth in 28 U.S.C. § 2254(d) for granting relief on a claim rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating

state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Richter*, 562 U.S. at 102, and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).  Petitioner carries the burden of proof. *Id.*

Even that demanding review, however, is ordinarily only available to state inmates who have fully exhausted their remedies in the state court system.  Title 28 U.S.C. §§ 2254(b) and (c) provide that a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has presented the same claim sought to be redressed in a federal habeas court to the state courts. *Pinholster*, 563 U.S. at 182.  This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509 (1982).  Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *Picard v. Connor*, 404 U.S. 270 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (explaining that exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review").  Moreover, the substance of the claim must have been presented as a federal constitutional claim. *Gray v. Netherland*, 518 U.S. 152, 162–63 (1996).

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine).  If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, a petitioner ordinarily is barred from seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977); *see also Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and

adequate to support the judgment."); *Coleman v. Thompson*, 501 U.S. 722 (1991) (same).    If a claim has never been presented to the state courts, but a state court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim), then the claim is technically exhausted, but procedurally barred. *Coleman*, 501 U.S. at 731–32.

　　If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in fundamental miscarriage of justice." *Id.* at 750.   The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman*, 501 U.S. at 754).   "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him [;] . . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753 (emphasis in original).   Examples of cause include the unavailability of the factual or legal basis for a claim or interference by officials that makes compliance "impracticable." *Id.*   To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)); *see also Ambrose v. Booker*, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their default").   "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000).   Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

　　Because the cause and prejudice standard is not a perfect safeguard against fundamental

miscarriages of justice, the United States Supreme Court has recognized a narrow exception to

the cause requirement where a constitutional violation has "probably resulted" in the conviction

of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392

(2004) (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)); *accord Lundgren v. Mitchell*,

440 F.3d 754, 764 (6th Cir. 2006).

## IV.    ANALYSIS

### A.  SUFFICIENCY OF THE EVIDENCE

The petitioner alleges in Claim 1 that there was insufficient evidence of serious bodily

injury to support his convictions for aggravated child abuse in Counts 1 and 6 and insufficient

evidence that he committed the offense underlying the aggravated child abuse conviction in

Count 3. (Doc. No. 1 at 4–5.)   He challenged the sufficiency of the evidence for all of his

convictions on direct appeal.  As pertinent to the current claim, the Tennessee Court of Criminal

Appeals found as follows:

> The appellant argues that the evidence is insufficient to support the convictions.
> When an appellant challenges the sufficiency of the convicting evidence, the
> standard for review by an appellate court is "whether, after viewing the evidence
> in the light most favorable to the prosecution, any rational trier of fact could have
> found the essential elements of the crime beyond a reasonable doubt." *Jackson v.
> Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e). The State is
> entitled to the strongest legitimate view of the evidence and all reasonable or
> legitimate inferences which may be drawn therefrom. *See State v. Cabbage*, 571
> S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses
> and the weight and value to be afforded the evidence, as well as all factual issues
> raised by the evidence, are resolved by the trier of fact. *See State v. Bland*, 958
> S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the
> evidence, nor will this court substitute its inferences drawn from the
> circumstantial evidence for those inferences drawn by the jury. *See id.* Because a
> jury conviction removes the presumption of innocence with which a defendant is
> initially cloaked at trial and replaces it on appeal with one of guilt, a convicted
> defendant has the burden of demonstrating to this court that the evidence is
> insufficient. *See State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).
>
> A guilty verdict can be based upon direct evidence, circumstantial evidence, or a

combination of direct and circumstantial evidence. *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *State v. Marable*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

1. Aggravated Child Abuse - Counts 1, 3, 6, . . .

The appellant contends that the evidence is insufficient to support his aggravated child abuse convictions. A defendant is guilty of aggravated child abuse when the defendant commits the offense of child abuse and the conduct results in serious bodily injury to the child. Tenn. Code Ann. § 39-15-402(a)(1). Child abuse occurs when a person "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." Tenn. Code Ann. § 39-15-401(a). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). Bodily injury "includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(2). At the time of the appellant's trial, serious bodily injury was defined as bodily injury that involved

> (A) a substantial risk of death;
>
> (B) Protracted unconsciousness;
>
> (C) Extreme physical pain;
>
> (D) Protracted or obvious disfigurement; or
>
> (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty.

Tenn. Code Ann. § 39-11-106(a)(34)(A)–(E). FN3

> FN3 We note that in July 2009, two months before the appellant's trial, our state code was amended to define "serious bodily injury to the child" in Tennessee Code Annotated Section 39-15-402(d) as
>
>> includ[ing], but . . . not limited to, second-or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by

whipping children with objects.

> Moreover, "[a] broken bone of a child who is eight (8) years of age or less" was added to the list for serious bodily injury in Tennessee Code Annotated section 39-11-106(a)(34).

The trial court instructed the jury on criminal responsibility. A defendant is criminally responsible for an offense committed by another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the [defendant] solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2). "'[U]nder the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred.'" *State v. Dorantes*, 331 S.W.3d 370, 386 (Tenn. 2011) (quoting *State v. Phillips*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001)). In addition, "no specific act or deed need be demonstrated." *Id.* (citing *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998)). A defendant also is criminally responsible for an offense committed by another if,

> [h]aving a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the person fails to take a reasonable effort to prevent commission of the offense.

A step-parent and caretaker has a duty to protect a child from harm and provide the child with emergency attention. *State v. Hodges*, 7 S.W.3d 609, 623 (Tenn. Crim. App. 1998).

For count 1, the State alleged that the appellant committed aggravated child abuse on or about April 16, 2007, by causing severe head injuries to the victim, including a concussion, inability to open his eyes, and multiple facial bruises. The appellant asserts that the evidence is insufficient to support the conviction because it failed to establish that the victim suffered serious bodily injury. The evidence shows that the victim's eyes were swollen shut, that he had numerous bruises and abrasions on his face and upper body, and that he had knots on his head. He also had a concussion, which Dr. Stack explained was a disruption in brain function, and would not open his eyes. In our view, such injuries, particularly in a seventeen-month-old child, qualify as serious bodily injury. Therefore, the evidence is sufficient to support the conviction.

For count 3, the State alleged that the appellant committed aggravated child abuse on or about June 15, 2007, by causing severe head injuries to the victim, including anoxic brain damage, acute subdural and subarachnoid hemorrhages, retinal hemorrhages, and severe seizures. The appellant asserts that the evidence is insufficient to support the conviction because the evidence is entirely circumstantial and indicates the victim's mother caused the injuries. Dr. Moutsious testified that the victim had bleeds in his brain and that one of the

bleeds occurred within a couple of days of June 15. Although Dr. Moutsious could not say precisely when the bleed occurred, she was concerned that the victim had sustained a brain injury within minutes of the time he stopped breathing. The evidence demonstrated that the appellant and Watkins were the victim's sole caregivers in the days leading up to the victim's June hospitalization. Watkins told the police that she allowed the appellant to discipline the victim, that he took the victim into a room and shut the door, and that she heard thuds in the room. Moreover, the evidence showed that the appellant was alone with the victim just before the victim experienced the seizure that caused him to stop breathing. Therefore, the evidence is sufficient to show that the appellant caused the anoxic brain damage, acute subdural and subarachnoid hemorrhages, retinal hemorrhages, and severe seizures that the victim suffered on or about June 15.

For count 6, the State alleged that the appellant committed aggravated child abuse by causing a subdural hematoma and other brain trauma to the victim between May 29 and June 15, 2007. The appellant argues that the evidence is insufficient to support the conviction because (1) the State failed to show that the victim suffered a subdural hematoma and brain trauma other than the subdural hematoma and brain trauma related to count 3, (2) the State failed to show that the victim suffered serious bodily injury, and (3) the evidence does not ensure juror unanimity. Dr. Moutsious testified that the victim suffered multiple brain injuries that were caused by significant force. She said that while one of the victim's brain bleeds occurred within a couple of days of June 15, other bleeds were older than two weeks. In her opinion, the victim had a brain injury before the Wednesday, June 13, seizure. As stated above, Watkins and the appellant were the victim's sole caregivers, and Watkins testified that the appellant pushed the victim and "would thump" the victim when the appellant disciplined the victim. Also, in her statement to police Watkins said that she heard thuds when the appellant disciplined the victim. Therefore, the evidence is sufficient to show that the appellant caused prior brain trauma to the victim, which resulted in older brain bleeds. Moreover, we are unpersuaded by the appellant's claim that the victim did not suffer serious bodily injury. Bleeding in the brain, particularly bleeding that causes a seizure such as the one the victim experienced on Wednesday, June 13, involves substantial impairment of a function of a bodily organ. The evidence is sufficient to support the conviction for aggravated child abuse in count 6.

(Doc. No. 13-16 at 19–23.)

The respondent asserts that this ruling was reasonable. (Doc. No. 21 at 18.)  Petitioner

contends that it was "contrary to or involved an unreasonable application of clearly established

federal law." (Doc. No. 1 at 5.)

The right to due process guaranteed by the Constitution ensures that no person will be

made to suffer the onus of a criminal conviction except upon sufficient proof. The evidence is sufficient if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). The state court accurately identified this deferential standard and analyzed the evidence presented at trial in light of it, so the question presented is whether its conclusions amounted to an unreasonable application of the law or determination of the facts.

Analysis of an exhausted insufficient-evidence claim in the habeas context is doubly deferential: "First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the [state court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008). This review imposes a "standard . . . so demanding that '[a] defendant who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle.'" *Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2011) (en banc) (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)). Jurors have "broad discretion in deciding what inferences to draw from the evidence," and when there are "a number of plausible ways to interpret the record," the state court's interpretation must not be disturbed by a habeas court as long as it is among those plausible interpretations. *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (per curiam); *Renico v. Lett*, 559 U.S. 766, 778 (2010). The Supreme Court has explained how constrained a federal habeas court's review in these circumstances is:

> The opinion of the Court in *Jackson v. Virginia*, 443 U.S. 307 (1979), makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge

15

simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted).

Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

*Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam).

Accordingly, a federal court reviewing the sufficiency of the evidence on habeas review may not re-weigh evidence. *Marshall v. Lonberger*, 459 U.S. 422, 434, (1983). A reviewing court "faced with a record of historical facts that supports conflicting inferences must presume— even if it does not affirmatively appear on the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Wright v. West*, 505 U.S. 277, 296–97 (1992).

With regard to Count 1, the state appellate court reasonably concluded that there was evidence supporting a finding that the victim suffered injuries on or about April 16, 2007, and that those injuries constituted serious bodily injury. The petitioner does not explain why he believes those findings to be unreasonable. He might be focused on the fact that a concussion was not observable on the victim's CT scan. But Dr. Stack testified that evidence of a concussion is not found in CT scans and that he diagnosed the victim with a concussion based on clinical observations. (Doc. No. 13-6 at 33, 57.) Further, the finding that a concussion is a serious injury is reasonable in light of Dr. Stack's testimony that a concussion is an injury to the brain resulting in "disruption of the brain function" and greater susceptibility to further injury. (*See* Doc. No. 13-6 at 32–33.) Likewise, it is reasonable to conclude that the victim's inability to open his eyes and exhibiting "a lot of discomfort" when hospital staff tried to open his eyes evidenced serious bodily injury as defined by Tennessee law. (*See id.* at 24.)

It is indisputable that the victim suffered serious bodily injuries on or about June 15 as charged in Count 3, but the petitioner asserts that there is insufficient evidence to establish that he inflicted those injuries. There is no direct evidence in the record about precisely when or how those injuries were inflicted. As the state appellate court observed, however, there was evidence that the petitioner was alone with the victim when the victim stopped breathing, and Dr. Moutsios testified that the injury could have been inflicted within just a few minutes of that event. In fact, she testified that injury within minutes is "oftentimes" the case "when we see children present with such severe episodes of stopping breathing and seizure." (Doc. No. 13-7 at 41.) There are more than one "plausible ways to interpret the record" in this case, *Coleman*, 566 U.S. at 655, but the petitioner's inflicting serious bodily injury on the victim during those moments alone just before the victim stopped breathing is certainly among them. Accordingly, this court cannot conclude on habeas review that the state court's conclusion was "objectively unreasonable," as required to grant relief on this claim. *Cavazos*, 565 U.S. at 2.

The petitioner also disputes that there is sufficient evidence of "a subdural hematoma and other brain trauma" inflicted between May 29 and June 15, as charged in Count 6 and distinct from the Count 3 injury that occurred on or about June 15. (*See* Doc. No. 13-9 at 9–10 (state's election of offenses).) The victim was not hospitalized or evaluated by any medical professionals during the 17-day time period in question. Dr. Moutsios testified that, in addition to the acute bleeding in the victim's brain visible on the MRI performed in the early morning of June 16, there were indications on the MRI of "possible old subdurals" that were "older than two weeks." (Doc. No. 13-7 at 63.) She explained "[t]here's not a way to confirm that." (*Id.*) She testified that she was concerned that a seizure the victim reportedly suffered on June 13 was a "response[] to prior head injury" and that she believed he had suffered an injury to his brain

before that seizure (*id.* at 38), but there is no evidence connecting the June 13 seizure with suspected subdural hematomas that were more than two weeks old just a few days after June 13. The state elicited testimony from the victim's mother that the petitioner was alone with the victim for around five minutes on June 13 when the seizure occurred (Doc. No. 13-8 at 38–42), but again, the "old subdurals" revealed by the MRI could not have been caused by any injury on that date. Subdural hematomas more than two weeks old on June 16 must have been inflicted on or before June 1. There are four days of overlap between the May 29 beginning of the period charged in Count 6 and that date, but there is no evidence in the record about any incidents involving the victim and the petitioner on those particular dates.

The state appellate court relied on information from the victim's mother about the petitioner's mistreatment of the victim as evidence in support of the petitioner's conviction on Count 6. The mother, whom the prosecutor described in his closing argument as "not somebody of high intellectual abilities" and "not somebody who can get from Point A to Point B to Point C easily" (Doc. No. 13-9 at 13), either testified to or acknowledged having told the police the following relevant facts:

- "Whenever Mr. Watts would be inside the room with Christopher, he would push him and he would thump him up beside the head and he pulled his shirt up over his head one time that I had seen and let him run into the wall." (Doc. No. 13-8 at 65.)
- She once saw the petitioner push the victim, who "fell on his butt" and started crying, but did not appear to be injured. (*Id.* at 65–66.)
- "One time" she heard the victim fall and hit his head on the floor, but she did not actually see or hear it, she "just assumed." (*Id.* at 67.)
- She falsely told police that she heard loud thumps coming from inside the bedroom when the petitioner and the victim were in the bedroom. (*Id.* at 68.)
- She saw the petitioner "thump" the victim one time, which she explained meant flicking the victim with his fingers on the victim's forehead. (*Id.* at 69–70.)
- She falsely told police that she had heard the petitioner cause the victim to hit the

wall four times and the floor twice. (*Id.* at 98.)

The victim's mother was not asked for and did not provide any time frames for any of those events. The following exchange during re-direct examination by the prosecutor adequately captures the tenor of her testimony:

> Q.      So, I guess, the question then, Ms. Watkins, you admitted to the police that sometimes—a lot of times, every day, basically, you would hit your son with a belt, but you only caused bruises one time; right?
>
> A.      Yes, I did.
>
> Q.      So where did your son get all these other injuries, if it's only you and Mr. Watts that are caring for him?
>
> A.      I'm assuming Mr. Watts.
>
> Q.      Assuming. That's the word you used with the police; right, assuming? You told the police that you were assuming that Mr. Watts did these things?
>
> A.      Yes.
>
> Q.      And then later, you told them that you actually witnessed him doing things and heard things; right?
>
> A.      Yes, I did.
>
> Q.      So which is it, you're assuming or you actually witnessed and heard?
>
> A.      I witnessed some, but I—
>
> Q.      What, specifically, did you witness that caused injuries to your son?
>
> A.      Him pushing him, thumping him on the forehead, calling him a momma's boy, telling him to stop crying.
>
> Q.      Well, you told us when he pushed your son down the one time, your son landed on his butt and he didn't get hurt from that; right?
>
> A.      Yes, I did.
>
> Q.      You told us that when he thumped your son, he didn't get hurt, he just cried; right?
>
> A.      Yes.
>
> Q.      So when did your son get all these other serious injuries?
>
> A.      I guess whenever he was with Mr. Watts.

(Doc. No. 13-8 at 99–100.)

Again, the state's election of offense for Count 6 was that the petitioner "committed

19

aggravated child abuse *by causing a subdural hematoma **and** other brain trauma* to the victim *between May 29 and June 15, 2007*." (Doc. No. 13-26 at 5 (emphasis added).) A subdural hematoma is a specific medical condition, and aside from the acute hematomas supporting the conviction on Count 3 for causing acute subdural and subarachnoid hemorrhages on or about June 15, Dr. Moutsios testified that all of the other possible hematomas found on the victim's MRI on June 16 were more than two weeks old. To conclude that (1) the victim suffered a subdural hematoma during the 4-day overlap between that time period and the time period covered by Count 6, and (2) that subdural hematoma was the result of abuse, and (3) that abuse was perpetrated by the petitioner—the only evidence of which is Ms. Watkins's assumptions and guesses[3]—requires more than just an interpretation of the evidence in this case to which this court could defer. It requires rank speculation that is not supported by the evidence in the record.

A jury might arguably have made a reasonable inference that the petitioner inflicted some injury on June 13 to cause the seizure the victim reportedly experienced that day, but there is simply no evidence of a *subdural hematoma* inflicted on that day, as charged in Count 6. To the contrary, Dr. Moutsios's testimony was to the effect that the old hematomas were inflicted more than 12 days before June 13. The Tennessee Court of Criminal Appeals's apparent reliance on the June 13 seizure and Ms. Watkins's testimony to support the conviction on Count 6 was thus objectively unreasonable. Accordingly, the petitioner is entitled to relief on this part of his claim, and his conviction on Count 6 will be conditionally vacated.

B.  FAILURE TO SEVER OFFENSES

The petitioner alleges that the trial court's denial of his pre-trial motion to sever the trial

---

[3] As discussed below in Section IV.C, Ms. Watkins was an accomplice to Count 6, and her uncorroborated testimony could therefore not support a conviction on that count as a matter of state law.

of Counts 1 and 2, relating to abuse and neglect in April 2007, from the other counts "violate[d] Tennessee Rule of Criminal Procedure 13(b)" and "Rule 14(b)(1)." (Doc. No. 1 at 6.) He asserts that he "suffered great prejudice" from the failure to sever the counts for trial, but he does not identify any federal constitutional right that was violated by trying the offenses together. (*Id.*) Similarly, all eight pages of the petitioner's brief on direct appeal devoted to this issue focused on Tennessee Rules of Criminal Procedure—particularly Rule 14(b)(1)—and state decisional law construing them. (Doc. No. 13-14 at 35–43.) The Tennessee Court of Criminal Appeals' analysis of the claim likewise rested entirely on state law. (Doc. No. 13-16 at 15–17.)

Federal courts may grant the writ of habeas corpus only on the ground that the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62 (1991). "[F]ederal habeas corpus relief does not lie for errors of state law." *Estelle*, 502 U.S. at 67 (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Id.* at 67–68. The petitioner's claim that the trial court violated state rules of criminal procedure is thus not cognizable for review under Section 2254.

Moreover, even if the current claim rested on some federal constitutional ground, it would be deemed procedurally defaulted due to the failure to exhaust the federal claim in state court. The Sixth Circuit has identified four factors relevant to whether a petitioner's state court pleadings have "fairly presented" a federal claim: (1) relying on federal cases employing constitutional analysis, (2) relying on state cases employing federal constitutional analysis, (3) phrasing the claim in terms of constitutional law, or (4) alleging facts well within the mainstream of constitutional law. *Pudelski v. Wilson*, 576 F.3d 595, 606 (6th Cir. 2009) (citing *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)). The petitioner has not satisfied any of those

factors. The petitioner did not cite the federal constitution or any federal cases construing it in his state court brief. And one of the primary state cases on which he relied in state court makes explicit the "non-constitutional" nature of the relevant analysis under state law: "Whether a trial court should grant a severance under Tennessee Rule of Criminal Procedure 14(b)(1) involves primarily an evidentiary question, therefore, 'the effect of a denial of that right is weighed by the same standard as other non-constitutional evidentiary errors[.]'" *State v. Denton*, 149 S.W.3d 1, 15 (Tenn. 2004).

Accordingly, the court concludes that this claim is not cognizable in federal habeas review. Alternatively, the court concludes that any cognizable federal issue raised by this claim is procedurally defaulted and not subject to federal review.

## C. ACCOMPLICE INSTRUCTION

The petitioner alleges in this claim that "the trial court erred by instructing the jury that Lakeisha Watikins [sic] was an accomplice as a matter of law because the instruction amounted to a judicial comment on the evidence." (Doc. No. 1 at 6.) He exhausted this claim on direct appeal, where the state appellate court rejected it:

> The appellant argues that the trial court erred by instructing the jury that Lakeisha Watkins was an accomplice as a matter of law because the instruction amounted to a judicial comment on the evidence. The State argues that the trial court properly instructed the jury. We conclude that the appellant is not entitled to relief on this issue.
>
> At the conclusion of Watkins' testimony, the trial court informed the parties that "I have added about Lakeisha Watkins being an accomplice." Defense counsel answered, "Okay. Fine." The trial court continued, "And I am instructing that she is an accomplice and that her testimony would have to be corroborated." Defense counsel stated, "Fine." During the jury charge, the trial court instructed the jury as follows:
>
>> In this case, the Court charges you that the witness, Lakeisha Watkins, was an accomplice in the alleged offenses, and before the defendant can be convicted, you must find that this accomplice testimony has been sufficiently corroborated.

> An accomplice is a person who knowingly, voluntarily and with common intent with a defendant, unites with him or her in the commission of an offense.

After the trial court finished instructing the jury, defense counsel asked for a bench conference. During the conference, counsel stated,

> I apologize for not mentioning this earlier, but I ran into this. My problem is with the first sentence of the accomplice charge here, saying, the Court charges you that she was an accomplice. . . . The Court doesn't mean that. But it might infer to the Jurors that you're finding that she was an accomplice. I mean, as a matter of fact[.]

The trial court stated, "She is. I have to tell them. This is the law in this case. It's not whether they find her as an accomplice. She was."

A defendant has a "constitutional right to a correct and complete charge of the law." *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990). A charge resulting in prejudicial error is one that fails to fairly submit the legal issues to the jury or misleads the jury about the applicable law. *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997).

An accomplice is someone who "knowingly, voluntarily, and with common intent participates with the principal offender in the commission of the crime alleged in the charging instrument." *State v. Griffis*, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997). Generally, the question of a witness's status as an accomplice is answered by determining whether that person could have been indicted for the charged offense. *State v. Boxley*, 76 S.W.3d 381, 386 (Tenn. Crim. App. 2001). If the facts about the witness's participation in the crime are clear and undisputed, the trial court must declare the witness to be an accomplice as a matter of law and instruct the jury that the accomplice's testimony must be corroborated. *State v. Eric Ricardo Middleton*, No. W2010–01427–CCA–R3–CD, 2011 Tenn. Crim. App. LEXIS 833, *47, 2011 WL 5573730 (Tenn. Crim. App. Nov. 14, 2011) (citing *State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990)). However, if the facts are disputed or subject to different inferences, the jury should determine as a question of fact whether the witness was an accomplice. *State v. Anderson*, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997).

Initially, we note that the appellant failed to object when the trial court stated that it was going to give the accomplice as a matter of law instruction and failed to make a contemporaneous objection during the jury charge. *See* Tenn. R. App. P. 36(a). In any event, Watkins was indicted as a co-defendant in all but one of the counts, and a jury found her guilty prior to the appellant's trial. Therefore, Watkins was an accomplice as a matter of law with regard to counts 2 through 7, and the trial court properly instructed the jury. As to count 1, Watkins testified that she was not present when the victim's injuries occurred on April 16, and she was not charged with causing his injuries. Therefore, she was not an accomplice as a matter of law with regard to that count. However, as noted by the State, the trial court's instruction held the State to a higher burden, requiring the jury to find

that her testimony was corroborated. Therefore, the State has demonstrated that any error regarding the trial court's instruction was harmless. *See Rodriguez*, 254 S.W.3d at 371.

(Doc. No. 13-16 at 17–19.)

The respondent asserts that this claim is procedurally defaulted because the Tennessee Court of Criminal Appeals found it was waived by the failure to lodge a timely objection to the instruction in question. (Doc. No. 21 at 23.) The court disagrees. The state court "note[d]," as an "initial" observation, that the petitioner had not objected before or during the jury instruction. But it did not address whether the objection immediately after the instruction was sufficient to preserve the issue or whether any other circumstances avoided application of the state's waiver rule. Instead, it proceeded to analyze the petitioner's claim on the merits. When a claim has been raised and addressed in state court, federal habeas review is only foreclosed when the record demonstrates "unambiguous state-court reliance on a procedural default," which is not present in this case. *Henderson v. Palmer*, 730 F.3d 554, 561 (6th Cir. 2013) (quoting *Bowling v. Parker*, 344 F.3d 487, 499 (6th Cir. 2003)). The state court's use of the phrase "in any event" before turning to its merits analysis is akin to another state court's use of "notwithstanding," which the Sixth Circuit considered ambiguous:

> The language used by the Kentucky Supreme Court in its opinion reveals that it did not clearly rely on Bowling's procedural default to dismiss the claims raised in his supplemental motion. After noting that the claims were raised only in the struck supplemental pleadings, the Kentucky Supreme Court went on to consider the merits of those claims, stating, "Notwithstanding that his supplemental motion was struck by the trial court, in the interest of judicial economy we will review the seven additional claims of ineffective assistance of counsel raised in the motion." *Bowling II*, 981 S.W.2d at 551.
>
> There are two reasonable interpretations to which this statement is susceptible. The Kentucky Supreme Court may have been relying on the procedural default. Its dismissal of Bowling's claims on the merits would then be considered an alternative holding. In such a situation, we would consider the claims in the struck motion procedurally defaulted. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989)

(stating that "a state court need not fear reaching the merits of a federal claim in an alternative holding"); *Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998). However, the Kentucky Supreme Court may have well been using the word "notwithstanding" to ignore the issue of possible procedural default and consider the claims on the merits. In such a case, Bowling's claims would not be defaulted because the state court would not have been relying on the procedural bar in its disposition of the case.

We find both interpretations eminently plausible. The use of the word "notwithstanding" could suggest either that the Kentucky Supreme Court was enforcing the procedural default or that it was waiving it. Moreover, the possibility that the Kentucky Supreme Court was in fact waiving the default is amplified by the fact that it went on to consider Bowling's claims on the merits. *See Harris*, 489 U.S. at 266 n.13 (noting that "[w]hile it perhaps could be argued that this statement would have sufficed had the state court never reached the federal claim," the fact that "the state court clearly went on to reject the federal claim on the merits" makes it less clear that the state court actually relied on the procedural bar). Ultimately, the fact that both interpretations are sensible settles this issue in Bowling's favor, for there must be unambiguous state-court reliance on a procedural default for it to block our review. *See Gall v. Parker*, 231 F.3d 265, 321 (6th Cir. 2000), *cert. denied*, 533 U.S. 941 (2001).

*Bowling v. Parker*, 344 F.3d 487, 498–99 (6th Cir. 2003). Likewise, the ambiguity in the state appellate court's ruling on this claim settles the default issue in the petitioner's failure, and the court turns to the reasonableness of the state court's merits ruling.

The petitioner asserts that the state court "erred" by giving this instruction, but he does not explain whether or why he thinks the state appellate court's ruling was unreasonable. (Doc. No. 1 at 6.) Another district court in this state has very recently explained Tennessee's law regarding when a witness is deemed to be an accomplice:

"It is well-established in Tennessee that 'a conviction may not be based solely upon the uncorroborated testimony of an accomplice.'" *Gibbs*, 2013 WL 3324957, at *3 (quoting *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001)). A trial court must pronounce a witness to be an accomplice as a matter of law where "the evidence is clear and undisputed that [the] witness participated in the crime." *Id.* Where, "however, . . . the evidence is unclear, then the issue of whether a witness is an accomplice is a question of fact for the jury to decide, and if the jury decides that the witness is an accomplice, then it must determine whether there is sufficient evidence corroborating the witness's testimony." *Id.* (citing *State v. Griffis*, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997)).

*Gibbs v. Crowell*, No. 116CV01231STAJAY, 2019 WL 2719801, at *6 (W.D. Tenn. June 27, 2019). The petitioner does not cite any law for the proposition that such an accomplice instruction is unconstitutional. To the contrary, the Sixth Circuit has found on habeas review that it is error to *fail* to instruct that a codefendant is an accomplice as a matter of law whose testimony must be corroborated. *Abdur'Rahman v. Carpenter*, 805 F.3d 710, 716 (6th Cir. 2015) (explaining that "Abdur'Rahman's codefendant was an accomplice as a matter of law, so the trial court should have instructed the jury that his testimony had to be corroborated," and going on to find any error harmless); *accord Thompson v. Beck*, 181 F. App'x 747, 750 (10th Cir. 2006) (finding failure to instruct that a witness was an accomplice as a matter of law was harmless error). Accordingly, the petitioner's argument that such instructions constitute "judicial comment on the evidence" or are otherwise improper (*see* Doc. No. 1 at 6) is not supported by any federal law.

The state court determined that the accomplice instruction was in error to the extent that it applied to counts on which Ms. Watkins had not been indicted or convicted. But erroneous jury instructions will only warrant federal habeas relief if they were "so infirm that they rendered the entire trial fundamentally unfair." *Austin v. Bell*, 126 F.3d 843, 846 (6th Cir. 1997). The state court concluded that the petitioner was not prejudiced by any error in the accomplice instruction given at his trial, and he has not demonstrated that conclusion to be contrary to or an unreasonable application of any Supreme Court precedent. The petitioner is thus not entitled to relief on this claim.

### D. EXCESSIVE SENTENCE

The petitioner claims that his sentence is excessive for two reasons: (1) the trial court erred by ordering his sentences to run consecutively; and (2) the trial court relied on

enhancement factors not found by the jury or admitted by the petitioner in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). (Doc. No. 1 at 7.) On direct appeal in state court, he asserted the trial court erred in enhancing his sentence based on an "exceptional cruelty" enhancement factor and in ordering partial consecutive sentencing. (Doc. No. 13-14 at 84–91.) The Tennessee Court of Criminal Appeals rejected those claims:

> Finally, the appellant contends that his effective sentence is excessive because the trial court misapplied an enhancement factor and erred by ordering consecutive sentencing. The State contends that the appellant's effective seventy-five-year sentence is proper. We agree with the State.
>
> No witnesses testified at the appellant's sentencing hearing, but the State introduced the appellant's presentence report into evidence. According to the report, the then twenty-eight-year-old appellant was expelled from high school in the eleventh grade, never earned a GED, and had a one-year-old daughter. In the report, the appellant denied having any physical or mental disabilities but admitted using marijuana since he was thirteen years old. The report shows that the appellant worked as a laborer for Industrial Staffing from July 2006 to September 2007. According to the report, the appellant has two prior convictions for criminal trespassing and one prior conviction each for kidnapping, sexual battery, and casual exchange.
>
> The trial court found that the following enhancement factors applied to all of the appellant's convictions: (1), that the appellant "has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"; (4), that the victim "was particularly vulnerable because of age or physical or mental disability"; and (14), that the appellant abused a position of private trust. Tenn. Code Ann. § 40-35-114(1), (4), (14). The trial court gave great weight to the factors. The trial court also applied enhancement factor (5), that the appellant "treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense," to the appellant's convictions in counts 3 through 7, but did not give the factor much weight. Tenn. Code Ann. § 40-35-114(5). The trial court noted that the range of punishment for the appellant's aggravated child abuse and aggravated child neglect convictions, Class A felonies, was fifteen to twenty-five years and that his range of punishment for the child neglect conviction, a Class E felony, was one to two years. *See* Tenn. Code Ann. § 40-35-112(a)(1), (5). The trial court sentenced the appellant as a Range I, standard offender to the maximum punishment in the range for all seven convictions.
>
> Regarding consecutive sentencing, the trial court found the appellant to be a dangerous offender "whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is

high." Tenn. Code Ann. § 40-35-115(b)(4). The trial court explained,

> This was a very young child who was severely abused. The defendant has been convicted of that. Now, the mere fact that I have found that factor four applies does not stop the inquiry because pursuant to *Wilkerson* I have to find that there's an aggregate term reasonably related to the severity of the offenses, and it's necessary to protect the public from further serious criminal conduct by the defendant. He has previously been convicted of some very serious offenses involving sexual battery and kidnapping. He then—on this particular series of events there's like three separate things that are going on. You've got the first incident in April, then you've got the broken arm, and then you've got the other. So I think that there is some need to—for consecutive sentences in this particular case.

The trial court merged count 2 into count 1. The trial court ordered that the appellant's twenty-five year sentences in counts 3, 4, and 5 be served concurrently with each other and that his twenty-five year sentences in counts 6 and 7 be served concurrently with each other. However, the trial court ordered that the two effective twenty-five year sentences be served consecutively to each other and consecutively to his twenty-five year sentence in count 1 for a total effective sentence of seventy-five years in confinement.

Appellate review of the length, range or manner of service of a sentence is de novo. *See* Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* Tenn. Code Ann. §§ 40-35-102, -103, -210; *see also State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence. *See* Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. *Id.* at (d); *Ashby*, 823 S.W.2d at 169.

The appellant asserts that the trial court misapplied enhancement factor (5) regarding the victim's being treated with exceptional cruelty. In *State v. Arnett*, 49 S.W.3d 250, 258 (Tenn. 2001), our supreme court concluded that the exceptional cruelty factor is applicable in cases of "extensive physical abuse or torture." In this case, the appellant's acts of abuse and neglect in April and June caused the victim to have a concussion, bleeding in the brain, retinal hemorrhages, and

seizures. The trial court did not err by applying factor (5). In any event, the trial court gave great weight to enhancement factors (1), (4), and (14) but little weight to factor (5). Therefore, even if the court had misapplied enhancement factor (5), it would not have justified reducing the appellant's sentences.

The appellant also argues that the trial court erred by ordering consecutive sentencing. Specifically, the appellant contends that the State failed to establish that his effective seventy-five-year sentence is reasonably related to the severity of the offenses or necessary to protect the public.

In order to find that a defendant is a dangerous offender, a court must also find that (1) the sentences are necessary in order to protect the public from further misconduct by the defendant and that (2) the terms are reasonably related to the severity of the offenses. *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995); *see also State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999). In the instant case, the trial court found that the appellant had been previously convicted of serious offenses. The court also noted that the victim was severely abused in this case. The court properly addressed the *Wilkerson* factors. Accordingly, the appellant is not entitled to relief on this issue.

(Doc. No. 13-16 at 24–28.)

The petitioner's state-court brief did not raise, and the state appellate court did not address, any claim that the petitioner's sentence was enhanced in violation of *Apprendi*. He simply asserted in state court that the evidence did not support one of the four enhancement factors applied. The state appellate court rejected that claim on the merits, and the petitioner does not reassert it here. Accordingly, the petitioner's *Apprendi* claim that his sentence enhancement violated federal constitutional law is procedurally defaulted and not subject to habeas review.

With regard to the petitioner's claim about consecutive sentencing, he has not demonstrated that the state court's determination was contrary to or an unreasonable application of any clearly established federal law. Absent evidence that a petitioner's sentence exceeded the statutory maximum for his crime, the length of his sentence is typically not cognizable in habeas corpus proceedings. *See Hutto v. Davis*, 454 U.S. 370, 373–74 (1982); *Austin v. Jackson*, 213 F.3d 298, 301–02 (6th Cir. 2000). The petitioner's sentences were within the statutory ranges for

his offenses, and the state court reasonably found that the severity of his new offenses combined

with his prior convictions for serious crimes warranted consecutive sentencing under state law.

In the absence of any federal law dictating against that determination, the petitioner is not

entitled to relief on this claim.

E.  COUNSEL'S ADVICE ABOUT WAIVING RIGHT TO TESTIFY

The petitioner claims that his trial counsel was ineffective for advising him to waive his

right to testify, failing to prepare him to testify, and "refus[ing] to allow[] him to testify." (Doc.

No. 1 at 7.)  He alleges that but for counsel's ineffectiveness, he could have testified and rebutted

Watkins's testimony. (*Id.*)  At the point during trial when the defense advised the trial court that

the petitioner would not be testifying, the petitioner was placed under oath and had the following

exchange with the court:

> THE COURT: All right. Mr. Watts, you have an absolute right to testify in this case. That's your choice. Mr. Engle and Ms. McWeay can give you all kinds of advice about that, but you ultimately have to decide that. After the State's proof is finished and we only have a little more to go—then you can testify if you want to. And if you choose not to, I will tell the Jury they can't consider your decision not to testify for any reason. Now, I have a form that you have signed—that you and Mr. Engle have signed today that tells me that you are not wanting to testify.  Is that correct?

> DEFENDANT WATTS:  Yes, ma'am.

> THE COURT: Have you thoroughly discussed with him about testifying or not testifying?

> DEFENDANT WATTS: Yes, ma'am.

> THE COURT: Okay. And after you discussed that with him, then did you decide not to testify?

> DEFENDANT WATTS: Yes, ma'am.

> THE COURT: Okay.  Is anybody forcing you to do that?

> DEFENDANT WATTS: No, ma'am.

> THE COURT: Okay.  So it's your choice?

> DEFENDANT WATTS: Yes, ma'am.

THE COURT: You signed this form after you talked to him; is that correct?

DEFENDANT WATTS: Yes, ma'am.

THE COURT: Well, I'm going to date it today, which is September the 2nd. And this will be made part of the record.

(Doc. No. 13-8 at 116–18.)

The petitioner asserted during post-conviction proceedings that "Trial Counsel did not explain . . . the significance of his choice not to testify at trial" and that the petitioner "was unable to fully evaluate his decision not to testify prior to signing the waiver." (Doc. No. 13-24 at 11–15.) The Tennessee Court of Criminal Appeals summarized the relevant post-conviction testimony and rejected that claim:

> Trial counsel testified that he and the petitioner discussed the petitioner's potential testimony during their numerous meetings prior to trial. They discussed the subject of the proposed testimony, topics the petitioner should be prepared to address, things the petitioner should do while testifying, and things the petitioner should avoid while testifying. They also discussed the adverse consequences of testifying. Trial counsel felt some of the things the petitioner intended to say at trial would not be helpful to his case. For example, the petitioner wanted to testify regarding his good character. Trial counsel cautioned that by raising his character, the petitioner may open the door to questions from the State about his prior convictions for sexual battery and kidnapping.
>
> During the break at the conclusion of the State's case-in-chief, trial counsel and the petitioner again discussed the petitioner's potential testimony. They discussed whether the testimony would be helpful given the fact the jury had already heard the redacted statement he gave to police. According to trial counsel, it was the petitioner's decision not to testify. During his *Momon* hearing,[4] the trial judge confirmed the petitioner willingly waived his right to testify.
>
> The petitioner was the final witness to testify during the post-conviction hearing. The petitioner complained his attorney did not fight for him. . . . The petitioner wanted a trial continuance because he felt they were not ready for trial. Trial counsel never gave him a step-by-step explanation of what they were going to do at trial or prepared him to testify. During their meetings, trial counsel would give up and simply walk away from the table.

---

[4] In *Momon v. State of Tennessee*, 18 S.W. 3d 152 (Tenn. 2000), the Tennessee Supreme Court held that a defendant's constitutional right to testify should be safeguarded by hearings demonstrating on the record that any waiver of that right is intentionally made by the defendant personally. Those hearings, like the one quoted above regarding the petitioner's waiver of his right to testify, are commonly referred to in Tennessee as "*Momon* hearings."

The petitioner testified that he dropped out of school in the seventh or eighth grade. Due to his lack of education, the petitioner did not understand the "big words" used by his lawyer. He felt this was part of the reason his lawyer did not want him to testify. According to the petitioner, sometimes "how I talk it might not come out right," so his lawyer thought he would say something detrimental in front of the jury.

The petitioner wanted to testify so the jury would hear his story. He was present at the home where the child was injured but innocent of the abuse and neglect charges. He also wanted to tell the jury that he is not an abusive person, but trial counsel told him that testimony would open the door to his prior convictions. Eventually, after the trial went forward and his witnesses were not subpoenaed, he "was like forget it" and signed the waiver form. When questioned by the trial judge as to his statement at trial that he willingly signed the waiver, the petitioner said he lied. According to the petitioner, trial counsel decided he would not testify.

The petitioner testified the statement he gave police was true and admitted that the jury heard a redacted version of that statement at trial. According to the petitioner, had he been called as a witness, his testimony would have been similar to the redacted statement. In addition, the petitioner would have asserted his innocence, answered the State's questions, and told the jury he is not an abusive person.

. . .

The petitioner contends trial counsel was ineffective by failing to adequately prepare him to testify at trial, instead advising him to waive his right to testify. Trial counsel testified at the post-conviction hearing that he met with the petitioner approximately thirty-seven times prior to trial. During these meetings, trial counsel and the petitioner discussed potential witnesses, the petitioner's proposed testimony, and the potential negative consequences of the petitioner's proposed testimony, including the possibility his prior criminal record might be used against him. Trial counsel also expressed concerns regarding the relevance and helpfulness of some of the petitioner's proposed testimony. Trial counsel and the petitioner again discussed the petitioner's testimony at the close of the State's proof. According to trial counsel, following these discussions, the petitioner decided not to testify. Despite later arguing he lied, the petitioner confirmed at his *Momon* hearing that he understood his rights, and it was his decision not to testify. The post-conviction court found trial counsel's testimony regarding his trial preparation, discussions with the petitioner, and the petitioner's decision not to testify to be credible. Giving deference to trial counsel's trial strategy, the petitioner has failed to show trial counsel was deficient in preparing him for trial, including his advice regarding testimony. The petitioner is not entitled to relief on this issue.

Interwoven with his claim that trial counsel failed to adequately advise him concerning his right to testify, the petitioner claims trial counsel was ineffective in failing to explain the accomplice jury instruction to him. The petitioner, claiming the accomplice jury instruction "removed to a significant degree, the State's

burden of proof since the jury was essentially instructed as a matter of fact by the Judge prior to deliberation that the child in this case was in fact abused and/or neglected," contends he would have testified if he had been fully informed about the instruction. However, this Court addressed the impact of the accomplice instruction on the State's burden of proof on direct appeal and determined that, contrary to the petitioner's claim, the "trial court's instruction held the State to a higher burden, requiring the jury to find that [the accomplice's] testimony was corroborated. *Watts*, 2012 WL 1591730 at *16.

Additionally, even if trial counsel was deficient in failing to adequately advise the petitioner concerning the accomplice instruction, the petitioner failed to show how he was prejudiced by trial counsel's actions. As noted by the post-conviction court, the petitioner "was able to present his version of events through his police statement that was played for the jury," and the petitioner "had no additional substantive additions to this initial statement." Furthermore, the post-conviction court accredited the testimony of trial counsel concerning the numerous discussions he had with the petitioner concerning his right to testify, including his concern that the petitioner would open the door to questioning about his prior convictions for sexual battery and kidnapping should he testify. The petitioner is not entitled to relief on this claim.

(Doc. No. 13-26 at 7–8, 12–13.)

All federal claims of ineffective assistance of counsel are subject to the highly deferential two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing the defendant; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive the defendant of a fair trial. *Id.* at 687. To meet the first prong, a petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness," and must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" *Id.* at 688–89. The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). Prejudice, under *Strickland*, requires showing that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The Supreme Court has further explained the *Strickland* prejudice requirement as follows:

> In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, *Strickland* asks whether it is "reasonably likely" the result would have been different. This does not require a showing that counsel's actions "more likely than not altered the outcome," but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case." The likelihood of a different result must be substantial, not just conceivable.

*Harrington v. Richter*, 562 U.S. 86, 111–12 (2011) (internal citations omitted).

As discussed above, however, a federal court may not grant habeas relief on a claim that has been rejected on the merits by a state court, unless the petitioner shows that the state court's decision "was contrary to" law clearly established by the United States Supreme Court, or that it "involved an unreasonable application of" such law, or that it "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. §§ 2254(d)(1) and (2); *Williams v. Taylor*, 529 U.S. 362, 412 (2000). Thus, when an exhausted claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. at 101. As the Supreme Court clarified in *Harrington*,

> This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA,

though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Id.* (internal quotation marks and citation omitted).

The Tennessee Court of Criminal Appeals correctly identified and summarized the *Strickland* standard applicable to this claim. (Doc. No. 13-26 at 10–12.) Accordingly, the critical question is whether the state court applied *Strickland* reasonably.

Petitioner has not established that this disposition of his claim was objectively unreasonable. The state courts obviously credited counsel's testimony that he repeatedly discussed the petitioner's potential testimony with him, that he had strategic reasons for advising against testifying, and that it was the petitioner's decision not to testify. Moreover, the trial court had the opportunity to witness the petitioner's demeanor during both his *Momon* hearing and his post-conviction hearing and assess his credibility relative to counsel's. "[F]ederal habeas courts do not have license, under § 2254(d), to redetermine witness credibility, whose demeanor is observed exclusively by the state court." *Givens v. Yukins*, 238 F.3d 420 (Table), 2000 WL 1828484, at *10 (6th Cir. Dec. 5, 2000) (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). Accordingly, this court cannot find the state court's conclusion that counsel did not perform deficiently to be unreasonable on this record. Moreover, the petitioner's proposed testimony would have added nothing to the recorded statement seen by the jury except for the petitioner's beneficial assessment of his own character, which would have opened the door to— and been effectively rebutted by—his prior convictions for kidnapping and sexual battery. Under those circumstances, the state court reasonably found that the petitioner was not prejudiced by counsel's advice not to testify.

Because the state court's ruling on this claim was neither contrary to nor an unreasonable application of *Strickland*, the petitioner is not entitled to relief on this claim.

## F. COUNSEL'S FAILURE TO CALL WITNESSES

The petitioner claims that trial counsel was ineffective for failing to call thirteen witnesses who would have testified that Ms. Watkins was responsible for the injuries to the victim. (Doc. No. 1 at 8.) Specifically, the petitioner points to the potential testimony of Richard Watts, who testified at the post-conviction hearing that he saw the victim healthy and happy in Ms. Watkins's home on one of the days of alleged abuse and that the petitioner spent time with other children and never harmed them. (*Id.*)

The petitioner exhausted a claim in post-conviction proceedings about counsel's failure to call witnesses. The Tennessee Court of Criminal Appeals summarized the relevant testimony and rejected the claim:

> The post-conviction court subsequently held a hearing in which potential witness Richard Watts, trial counsel, and the petitioner testified. Mr. Watts testified that he is the petitioner's brother and could have testified at trial but was not subpoenaed. According to Mr. Watts, had he been called as a witness, he would have testified that he was at Ms. Watkins' home on one of the days the alleged abuse occurred, and the child was happily playing and appeared healthy. He did not see anyone injure the child.
>
> Mr. Watts testified that the petitioner had a good relationship with his teenaged daughter, and when he was not incarcerated, he spent every other weekend with her. To Mr. Watts' knowledge, the petitioner has never abused his daughter. Mr. Watts also testified that he has allowed the petitioner to be alone with his children and no abuse occurred. If Mr. Watts thought either Ms. Watkins or the petitioner abused the victim, he would have reported it to the authorities himself.
>
> . . .
>
> Trial counsel [testified that he] met with the petitioner approximately thirty-seven times prior to trial. The petitioner gave him a list of thirteen potential witnesses during one of their meetings. Some of the witnesses had irrelevant information or raised questions of character that were not germane to the case. Many of the witnesses could not be located. Both trial counsel and his investigators spoke with several family members in an attempt to track down the missing witnesses, but it

was not possible to find all thirteen. Ultimately, trial counsel decided not to subpoena any of the witnesses suggested by the petitioner.

The petitioner never mentioned his brother was in Ms. Watkins' home the morning of one of the incidents of abuse. Instead, when trial counsel and the petitioner discussed Mr. Watts, their conversations focused on using Mr. Watts to help find other witnesses, and Mr. Watts agreed to assist. When discussing the petitioner, Mr. Watts never mentioned to trial counsel or the investigators that he was present in Ms. Watkins' home on one of the days the victim was injured.

. . .

The petitioner was the final witness to testify during the post-conviction hearing. . .. When he asked trial counsel about the thirteen witnesses, trial counsel simply said his investigators were on it, but he would never tell the petitioner what the investigators were doing or what they needed to locate the witnesses. The petitioner wanted a trial continuance because he felt they were not ready for trial.

. . .

The petitioner has likewise not shown trial counsel provided ineffective representation by failing to subpoena the thirteen alleged witnesses suggested by the petitioner. The petitioner only called one of the alleged witnesses at his post-conviction hearing—Richard Watts. According to Mr. Watts, had the petitioner called him as a witness at trial, he would have testified that he was in Ms. Watkins' home on one of the dates of abuse, and the victim was seemingly healthy and happily playing. In addition, he would have testified that the petitioner frequently spent time with his own daughter, as well as Mr. Watts' children, and never harmed them. Trial counsel testified that he had been in contact with Mr. Watts prior to trial, and Mr. Watts only provided assistance with locating witnesses. Neither Mr. Watts nor the petitioner advised trial counsel that Mr. Watts had been in the home on one of the dates of abuse.

Trial counsel's conduct must be evaluated from his perspective at the time he decided not to call Mr. Watts has a witness. Trial counsel offered detailed testimony regarding the steps he took to prepare for trial, and during his investigation, he never learned that Mr. Watts had been present on one of the dates of abuse. The post-conviction court accredited the testimony of trial counsel, and we will not reweigh or reevaluate this evidence on appeal. Giving deference to trial counsel's tactical decision not to call Mr. Watts as a witness, the petitioner has not established trial counsel was deficient in this regard. The petitioner is not entitled to relief on this issue.

In addition, the petitioner failed to call the remaining twelve witnesses to testify at his post-conviction hearing. When a petitioner contends trial counsel failed to discover, interview, or present witnesses in support of his defense, the petitioner must call those witnesses to testify at an evidentiary hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). This is the only way the petitioner can establish:

that (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.

*Id.* Even if a petitioner is able to show counsel was deficient in the investigation of the facts or calling a known witness, the petitioner is not entitled to post-conviction relief unless he produces a material witness at his post-conviction evidentiary hearing who "(a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called." *Id.* at 758. Without doing this, the petitioner cannot establish the prejudice requirement of the two-prong *Strickland* test. *Id.*

In the present matter, the petitioner has not shown he was prejudiced by trial counsel's decision not to subpoena the remaining twelve witnesses. The petitioner did not present those witnesses at his post-conviction evidentiary hearing, and we will not speculate as to what those witnesses would have said if called to testify at trial. *See Black*, 794 S.W.2d at 757. The petitioner is not entitled to relief on this issue.

(Doc. No. 13-26 at 5–7, 13–14.)

As this court observed above, the state court correctly identified and summarized the *Strickland* standard applicable to this claim. Accordingly, the petitioner is only entitled to relief if he can demonstrate that the state court's ruling was unreasonable. But the petitioner's habeas petition does not identify any portion of the state court's ruling as objectively unreasonable. (Doc. No. 1 at 8.) The petitioner restates his brother's proposed testimony, but he does not acknowledge that the state court credited counsel's testimony that nobody told him that the brother was at the scene of any of the alleged abuse or demonstrate that the court's credibility assessment was unreasonable. He also does not point to any facts or law making it unreasonable for the state court to have credited counsel's testimony to the effect that he made a strategic decision not to offer testimony that was irrelevant or amounted to character evidence, such as the brother's proposed testimony that the petitioner had not abused other children with whom he

spent time.

And finally, the state court's conclusion that the petitioner had failed to establish that counsel was ineffective in failing to present testimony from any other witnesses is not only reasonable but fully supported by federal law. *See Hutchison v. Bell*, 303 F.3d 720, 748–749 (6th Cir. 2002) (noting that "a petitioner cannot show deficient performance or prejudice resulting from a failure to investigate if the petitioner does not make some showing of what evidence counsel should have pursued and how such evidence would have been material").

The state court concluded that the petitioner failed to demonstrate either deficient performance or prejudice arising from counsel's decision not to present witnesses, and the petitioner has not demonstrated that those conclusions were unreasonable. Accordingly, he is not entitled to relief on this claim.

## G. COUNSEL'S FAILURE TO FILE MOTION IN LIMINE

The petitioner alleges that trial counsel was ineffective for "failing to file a motion in limine to exclude reference to the facts Ms. Watkins lived in the projects and the petitioner lived on the streets" and that the state court "committed errors" in rejecting this claim in post-conviction proceedings. (Doc. No. 1 at 8.)

Petitioner raised this claim in his amended post-conviction petition. (Doc. No. 13-20 at 75.) During the post-conviction hearing, the petitioner's post-conviction counsel identified the allegedly objectionable references in question,

> Including during the State's opening statement where the ADA referenced (1) that Ms. Watkins lived on South 7th where she "rented an apartment in public housing," (Trial Rec., Ex. 2, vol. 2, at 7); (2) Ms. Watkins purchasing a taco plate from a "food bootlegger," which was defined as "someone in the projects who sells food, not a restaurant, not a licensed facility but someone who will sell food to others," (*id.* at 19); and (3) multiple references to "housing projects," (*see*, *e.g.*, *id.* at 18 & 19).

(Doc. No. 13-20 at 101.)  The Tennessee Court of Criminal Appeals summarized the relevant testimony and went on to deny relief on this claim:

> Trial counsel admitted that during trial, he never objected to the references made by the State to the petitioner's and Ms. Watkins' living in a housing project. Instead, he questioned prospective jurors about this during voir dire by inquiring into whether the petitioner's poverty caused bias. Trial counsel admitted these references could have prejudiced his client.
>
> . . .
>
> The petitioner next argues trial counsel provided ineffective assistance by failing to file a motion in limine to exclude reference to the facts Ms. Watkins lived in the "projects" and the petitioner "lived on the streets." We disagree. Trial counsel testified that rather than filing a motion in limine, he questioned potential jurors during voir dire regarding potential bias caused by the petitioner's economic status. This was a strategic decision made after what the record reflects was adequate preparation for trial.
>
> This Court must be highly deferential to counsel's performance. *Burns*, 6 S.W.3d at 462. We will not grant the petitioner the benefit of hindsight by second-guessing reasonably based trial strategy. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Moreover, "[t]he fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation." *Goad*, 938 S.W.2d at 369. Again giving deference to trial counsel's strategy, the petitioner has failed to show counsel was deficient by failing to exclude references to the "projects" and "living on the streets"[5] prior to trial. Accordingly, he is not entitled to relief on this issue.

(Doc. No. 13-26 at 6, 14.)

As this court has already observed, the state court identified the correct standard applicable to this claim under *Strickland*.  Pursuant to that standard, there is a "strong presumption" that trial counsel's actions were based upon "sound trial strategy" and were, therefore, not deficient. *Strickland*, 466 U.S. at 688–89.  Accordingly, it was not unreasonable for the state court to defer to counsel's strategic decision to mitigate any impact of the

---

[5] The court notes that neither the petitioner's amended post-conviction petition, his post-conviction appellate brief, the post-conviction trial court's ruling, nor the Tennessee Court of Criminal Appeals's opinion contains any citation to any reference at trial to the petitioner's living "on the streets," and the court has been unable to locate any such reference in the record.

petitioner's impoverished circumstances during jury selection rather than by contesting the admissibility of evidence about his living arrangements and the scene of the crimes.[6] The petitioner's belief that the state court's ruling was error does not make it objectively unreasonable, as required to merit relief under AEDPA.

## H. CUMULATIVE EFFECT OF COUNSEL'S INEFFECTIVENESS

Finally, the petitioner asserts that his case merits habeas relief based on the cumulative effect of trial counsel's ineffectiveness. (Doc. No. 1 at 8.) The Tennessee Court of Criminal Appeals rejected this claim on post-conviction appeal:

> The petitioner argues the cumulative effect of trial counsel's inadequate representation requires a new trial. The cumulative error doctrine recognizes that there may be many errors committed in trial proceedings, each of which constitutes mere harmless error in isolation, but "have a cumulative effect on the proceedings as great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). When considering cumulative error, this Court may look to the case as a whole, the numbers of errors committed, their interrelationship and combined effect, and the strength of the State's case. *Id.* (quoting *United States v. Sepulveda*, 15 F.3d 1161, 1196 (1st Cir. 1993)). In this case, the petitioner failed to carry his burden of showing trial counsel deviated from the required standard of assistance. Accordingly, the petitioner has not established that the cumulative effect of trial counsel's errors resulted in prejudice. The petitioner's claim is without merit.

(Doc. No. 13-26 at 14–15.)

This claim fails on habeas review for at least two reasons. First, cumulative-error claims are not cognizable on habeas review because the Supreme Court has never held that cumulative errors may form the basis for issuance of a writ of habeas corpus. *Sheppard v. Bagley*, 657 F.3d

---

[6] Moreover, the petitioner's counsel himself elicited testimony from the Child Protective Services case manager, Falonda Tolston, about the fact that Ms. Watkins could have been evicted from the public housing project where she lived if it had become known that a non-family-member was living there with her. (Doc. No. 13-5 at 67.) It would be reasonable to conclude, therefore, that counsel made a strategic decision that knowledge of the public housing restrictions benefitted the petitioner's case by providing a benign explanation for why Ms. Watkins lied about whether the petitioner was living there.

338, 348 (6th Cir. 2011); *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002).  And second, the state court held that trial counsel did not commit any constitutional error in his representation of the petitioner, and this court has found that ruling to be reasonable.  Accordingly, there are no instances of ineffectiveness that could have had a cumulative effect on the outcome of the petitioner's case.  The petitioner is not entitled to relief on this claim.

## V.     CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus will be granted in part with respect to the petitioner's Claim 1, and a writ will issue on the portion of that Claim related to the petitioner's conviction on Count 6.  In all other respects, the petition will be denied.

An appropriate order shall enter.

ALETA A. TRAUGER
United States District Judge